149    57
164   628

WATSON SEMINARY, Appellant, v. COUNTY COURT OF PIKE COUNTY.

### Division Two, March 28, 1899.

1. **Charters**: CONTRACTS: IMPAIRED. A charter granted to directors chosen by the county court, the power to establish a seminary and provide for it out of the public funds, to wit, the fines, penalties and forfeitures collected by public law within such county. There were no private incorporators, nor stockholders, nor shares of stock which an individual could hold, but the corporation was created by the State for a public purpose, that of education. *Held*, first, that the seminary created was not a private but a public corporation; *and* second, that the charter is not a contract, and that no contract was impaired when the State by a subsequent act of the legislature repealed that part of the charter that authorized the county court to turn over to the seminary the fines, penalties and forfeitures collected through public law within the county

2. ———: ———: ———: GENERAL STATUTORY RESERVATION. Where there is a general statute in force at the time a special charter is granted to a corporation, which provides that the charter of any corporation "shall be subject to alteration, suspension and repeal in the discretion of the legislature," such general statute becomes a part of such charter, as much as if it had been written therein, and is a condition of the grant, and any subsequent repeal of any part of such special charter is in no sense an impairment of the obligation of a contract.

3. ———: CONSTRUCTION: GENERAL RULE. Only such powers and rights can be exercised under grants by the legislature, as are clearly comprehended within the words of the act or derived therefrom by necessary implication, regard being had for the object of the grant. Any ambiguity or doubt arising out of the terms used by the legislature, must be resolved in favor of the public.

4. ———: ———: RIGHTS OF PERSONS NOT PARTIES. It is not the duty of a court to determine the constitutional rights of persons who contributed money and land for the establishment of a seminary within their midst, unless they are made parties to a suit to determine the power of the legislature to repeal the seminary's charter.

5. ————: ————: PERMANENT RIGHT TO FINES, ETC. As fines, forfeit‑
ures and penalties accrue to the State from the violation of some‑
obligation to the State, or result from criminal prosecutions for
offenses against the State, each legislature may repeal the laws
creating them and enact new laws imposing different ones. Hence,
no person or institution can have a vested right therein. So that,
where the legislature by a special charter to a seminary, directed all
fines, penalties and forfeitures collected within the county to be
turned over to it, it did so subject to the right of the next legislature
to take away such benefits, and when it subsequently repealed that
part of the charter, it simply took from the seminary a gratuity or
privilege which it had granted without consideration.

*Appeal from Pike Circuit Court.*—Hon. REUBEN F. ROY,
Judge.

AFFIRMED.

TAPLEY & FITZGERRELL, A. R. COBURN and ELIJAH
ROBINSON for appellant.

(1) The act of March 12, 1859, undertaking to repeal
that part of the plaintiff's charter which appropriated to its
use the fines, penalties and forfeitures accruing to Pike
county, is in violation of those provisions of both the State
and Federal Constitutions, which forbid the enactment of
any law impairing the obligations of a contract. Sec. 1,
art. X, U. S. Constitution; sec. 17, art. XIII, Mo. Constitu‑
tion 1820; Trustees of Dartmouth College v. Woodword, 4
Wheat. 508; Clanters Bank v. Sharp, 6 How. 301; Trustees
of Vincennes University v. Indiana, 14 How. 168; Bank v.
Knoop, 16 How. 369; Binghampton Bridge case, 3 Wall. 51;
Wilmington v. Reid, 13 Wall. 266; Seibert v. Lewis, 122
U. S. 284; State ex rel. v. Greer, 78 Mo. 188; Scotland Co.
v. Railroad, 65 Mo. 135; Sloan v. Railroad, 61 Mo. 30.
(2) The whole scope and tenor of the act is utterly at vari‑
ance with almost every provision of the general corporation
law embodied in the Revised Statutes of 1845; and, by no
sort of reasonable or fair construction, can the conclusion be

Watson Seminary v. County Court of Pike Co.

reached that it was the intention of the legislature that the provisions of the general corporation law should enter into and form a part of the organic law of the institution created by the act of 1847. The right to alter, suspend or repeal the charter of a corporation, even if that provision ' of the statutes of 1845 could properly be held to. apply to this corporation, would not affect this case. The right to alter, suspend or repeal the charter of a corporation does not imply the power to destroy vested rights. Morawetz on Corp., sec. 1101; Miller v. State, 15 Wall. 495; Hyatt v. McMahon. 25 Barb.' 457; Railroad v. Dudley, 14 N. Y. 336; Ore v. Bracken Co., 81 Ky. 593; Detroit v. Plank Road Co., 43 Mich. 140.

W. H. Morrow and Ras. Pearson for respondent.

(1)   The Act of January 25, 1847, does not constitute a contract within the legal meaning of that word. (2) Nearly seven years had elapsed since the proposal (for that is the most that can be said of the Act of January 25, 1847), to grant to Watson Seminary these fines, penalties and forfeitures, and the proposal remained unaccepted *in toto* up to the said enactment of February 24, 1853, when by legislative act it was withdrawn, or repealed, by making another and definite disposition of all fines, penalties and forfeitures. When an act of the legislature confers a power or privilege it may be repealed at any time before the power has been exercised so as to confer a vested right. Covington & L. R. Co. v. Kenton Co. Ct., 12 B. Mon. 144; Bailey v. Mason, 4 Minn. 546; Union Parish Society v. Upton, 74 Me. 545; Moor v. Seaton, 31 Ind. 11; Dillon v. Linder, 36 Wis. 343; Tucker v. Ferguson, 22 Wall. 527.   (3)   If in any event, by virtue of the Act of January 25, 1847, Watson· Seminary became entitled to have these fines, penalties and forfeitures passed

over to the Watson fund for its benefit, such right was impliedly repealed by subsequent legislative acts of a general nature and subsequently adopted constitutional provisions. Acts of 1853, p. 151, sec. 2; 2 R. S. 1855, p. 1420, sec. 6; R. S. 1879, sec. 7103; R. S. 1889, sec. 8039; Acts 1893, p. 250; art. IX, sec. 5, Const. 1865; Art. XI, sec. 8, Const. 1875; Art. IV, secs. 46 and 47, Const. 1875; Art. IX, sec. 6, Const. 1875; Schedule, sec. 1, Const. 1875; Wallace v. Everett, 52 Mo. 64; Deal v. Miss. Co., 107 Mo. 464; Morawetz on Corp., secs. 463 to 468.    (4)    The legislative act of 1859 is constitutional.    Chin. L. & B. Co. v. Comm., 100 Pa. St. 438; In re Oliver Lee & Co.'s Bank, 21 N. Y. 9; Crease v. Babcock, 23 Pick. 334; Griffin v. Ins. Co., 3 Bush. 592; Railroad v. Duncan, 111 Pa. St. 352; Shields v. Ohio, 95 U. S. 319; McLaren v. Pennington, 1 Paige 102; Lothrop v. Stedman, 13 Blatch. 134; Tomlinson v. Jessup, 15 Wall. 454; Trustees of Dartmouth College v. Woodward, 4 Wheat. 518; Greenwood v. Freight Co., 105 U. S. 13; Pennsylvania College case, 13 Wall. 190; Miller v. State, 15 Wall. 478; Morawetz on Corp., secs. 463 and 464.    (5)    The Act of January 25, 1847, is detrimental to the general welfare and against public policy.    West River Bridge Co. v. Dix, 6 Howard, 507; Searl v. School Dist., 133 U. S. 553; McCulloch v. State, 4 Wheaton 316.    The Act in effect provides that all moneys paid into the county treasury by way of fines, penalties and forfeitures from January 25, 1847, shall be applied in perpetuity to the use of Watson Seminary.    Fines, penalties and forfeitures, in their very nature, are not grantable by legislative act so as to invest the grantee with such rights, or privileges, or property as to entitle the grantee, under any circumstances, to claim a vested right therein.    Morawetz on Corp., sec. 442; U. S. Mortg. Co. v. Gross, 93 Ill. 483.

GANTT, P. J.—Plaintiff sought by mandamus to require the county court of Pike county to place all "fines,

forfeitures and penalties" accruing to said county to the credit
of what is known in said county as the Watson fund for the
benefit of Watson Seminary.

The circuit court denied the peremptory writ and plain-
tiff appeals.

The history of the Watson fund "runneth thus:"

Samuel Watson died in Pike county prior to the year
1836, leaving a last will, which was duly probated February
2, 1836.   Samuel Watson made the following bequest in said
will:

"And it is further my will and desire that, after the
death of said Esther, two hundred dollars of the said sum be
set apart and the same is hereby bequeathed to the said county
of Pike for the purpose of supporting a free school for the
poor of said county.

"I give and bequeath to said county of Pike, the said
sum of one hundred dollars for the purpose of supporting a
free school for the poor of said county, and direct my executor
to pay the same into the treasury of said county, under the
direction of the county court, this, with the above mentioned
sum of two hundred dollars, making an entire sum of three
hundred dollars for the support of the free schools for the
poor.   It is my will and desire that the said sum shall be
loaned under the direction of the county court of said county,
and the interest be added to the principal from year to year
until there shall be some legal provision for free schools in this
State, and whenever free schools shall be established in said
county by law, then it is my will and desire that the interest
which may hereafter accrue on the sum total of principal and
interest up to the time of establishing such school, shall be
annually appropriated towards defraying the expenses of such
public school, reserving the said three hundred dollars and
the interest which may have accrued thereon before the
establishment of such public school as a permanent fund."

The present contention is grounded on an act of the General Assembly of Missouri, approved January 25, 1847. The following sections of said act sufficiently indicate its purpose and provisions:

"Section 1. A school is hereby established in the county of Pike by the name of 'Watson Seminary,' named in honor of Samuel Watson, deceased, of said county, the directors of which when selected as hereinafter required, are hereby constituted a body politic or corporate, with all the powers of corporation; and as such may sue and be sued, have a common seal, and hold such property, real and personal as may be necessary and proper to effect the purposes of its creation, under the name and style of the 'Watson Seminary.'

"Section 2. The principal and interest of the fund, donated by the said Samuel Watson, now under the control of said county of Pike, shall be and the same is hereby declared to be a permanent fund for the support of said seminary, and in addition thereto the amount of fines now in the treasury of the said county, and all the moneys which may hereafter accrue to said county by way of fine, penalty or forfeiture, which shall be paid into the treasury of said county as the same is paid in, shall be added to and shall become a part of said fund, and the whole shall be loaned out as the 'Watson Fund,' of said county, is now loaned, etc.

"Section 5. No part of the Watson fund above constitued, by the provisions of the second section of this act, shall be appropriated for any purpose whatever, until from the accumulation of interest thereon, and the payment of fines, penalties and forfeitures, the whole fund shall amount to the sum of two thousand dollars.

"Section 6. When the said fund shall reach the sum of two thousand dollars, it shall be the duty of the county court of Pike county, to give public notice by advertisement, that said seminary will be established, at such place in said

county as will contribute or procure the largest donation in money or real estate, for the erection of buildings for said seminary, and for establishing and purchasing a library and suitable apparatus for the same, and which may in other respects be most advantageous for the location of said seminary, said subscriptions shall designate the place where said seminary is to be located, and the amounts subscribed shall be secured to the satisfaction of the county court and made payable to the county of Pike, and filed in the office of the clerk of the county court.

"Section 7. At the term of the county court of said county of Pike, held next after the publication of the advertisement above mentioned, the said court shall appoint not less than three nor more than five commissioners, residents of one or more of the adjoining counties, who shall meet on a day fixed by said court at the courthouse in Pike county, and examine said subscriptions, and shall fix upon a location for said Watson Seminary, at the place having the largest subscription in value, in the opinion of said commissioners, and possessing the greatest advantages for the permanent location of said school. The said commissioners shall file a report in writing of their proceedings, with the clerk of the said county court, and the place designated by a majority of the commissioners in their report shall be the permanent location of said Watson Seminary.

"Section 8. So soon as the said seminary shall be permanently located, it shall be the duty of the county court to appoint nine directors," etc.

"Section 9. At the first term of the county court, after the necessary buildings are completed, and the school is in operation, the county court shall draw their warrant on the county treasurer, for the amount of interest due for the year preceding, in favor of such officers as may be appointed for that purpose by said board of directors, and the same shall be done annually thereafter.

"Section 11. The directors shall appoint such officers as may be necessary, and shall·fill all vacancies which may occur in their body by removal, resignation or otherwise.

"Section 12. The directors shall biennially make a report to the superintendent of common schools of the condition of said seminary, stating the number and ages of the pupils, the branches studied, the price of tuition, the amount received from interest on the fund, as well as from pupils, and any other information, calculated to show the condition of said school; also the property held by said seminary, and the amount of its indebtedness.

"Section 13. All the interest accruing upon the fund regulated by said Samuel Watson, at the time of the appointment of said directors, shall be appropriated towards the education of any indigent youths in said county of Pike, who may apply for the benefit of the same, and it shall be the duty of said board to have them educated at said seminary without charge of tuition, use of rooms or of any apparatus that may belong to said seminary.

"Section 17. The fines, penalties, and forfeitures, accruing to said county of Pike, after the organization of said seminary, shall still be paid into the county treasury, and be· applied to the increase of said permanent fund.

"Section 18. An act entitled 'An act to establish the Watson free school,' approved February 23d, 1843, is hereby repealed, as are all other acts and parts of acts inconsistent with the provisions of this act.

"This act shall take effect and be in force from and after its passage. Approved January 25, 1847." [Laws 1847, 198.]

On August 11, 1853, the county court of said county made an order reciting that the Watson fund then amounted to more than $2,000 and declared that said seminary would be located in such place in said county·as would contribute the largest donation in money and real estate, and directed

that notice be given in certain newspapers.   On the tenth of November, 1853, the county court appointed three commissioners to examine the subscription and fix the location of the seminary.   The people of Ashley donated $3,302 and four acres of land adjoining said town.   On December 20, 1853, the county court approved the location and appointed a board of trustees.   The county court subsequently at different times drew warrants on the Watson Seminary Fund.

In 1893 the county court refused to longer carry the fines, penalties and forfeitures accruing to said county, to the credit of the said Watson fund, but applied them to the common school fund of said county.

In 1859 (Laws of 1858-9, p. 46) the Legislature passed an act, approved March 12, 1859, whereby all or so much of the act of 1847 as appropriated the fines, forfeitures and penalties of said county to the Watson fund, was repealed and repealing all provisions giving said fund any portion of the school fund of said county.

Counsel for plaintiff seeks a reversal of the judgment below on the ground that the act of 1859 was unconstitutional in that it impaired the obligation of a contract made by the State with Watson Seminary.   This contention is controverted on various grounds, which will be noted in the discussion of the case.

Counsel for plaintiff invokes the authority of Dartmouth College v. Woodward, 4 Wheaton, 518, a case so famous and historical that it is often assumed that both the profession and the laity are acquainted with the principles decided and the facts upon which the opinion was based, but it is opined that no harm can result from a short restatement of the facts and the actual ruling thereon.   In 1769 George the Third granted a charter which recited that Dr. Eleazer Wheelock had established at his own expense a charity school for the instruction of Indians in the Christian religion; that he had

appointed agents to solicit contributions in England for extending the said charitable work, and had constituted the Earl of Dartmouth and others trustees of the moneys so raised and to be acquired, and authorized them to fix the site of the proposed college; that they determined to establish the college in the western part of New Hampshire, and that Dr. Wheelock had applied for a charter and in consideration of the foregoing premises a charter was granted, constituting the trustees of said college a body politic to be known by the name of "The Trustees of Dartmouth College," with power to acquire real and personal property, and to pay the salaries of officers and teachers; that Dr. Wheelock should be president and appoint his successor until such appointment should be disapproved by the trustees.    The trustees should have power to appoint and displace officers, make ordinances, orders and laws for the college, etc.

The charter was accepted, and the property contributed was conveyed to the corporation.    The college continued to be governed by this charter until 1816.    In the year last mentioned the Legislature of New Hampshire passed an act to amend the charter and enlarge and improve the corporation of Dartmouth College.    The proposed change was to increase the trustees from twelve to twenty-one, and various other changes.    The majority of the old corporation refused to accept the new charter, brought an action for trover against the new treasurer for the record books of the college, and the Supreme Court of New Hampshire having decided the new charter was constitutional, the case was removed by writ of error to the Supreme Court of the United States.    At the February term, 1819, the Supreme Court reversed the judgment of the Supreme Court of New Hampshire, holding that the Legislature had no power to amend the charter without the consent of the trustees and that the amending act impaired the obligation of contracts within the meaning of the Constitution of the United States.

Chief Justice MARSHALL among other reasons for so holding (p. 633) used this language: "Dartmouth College is really endowed by private individuals, who have bestowed their funds for the propagation of the Christian religion among the Indians, and for the promotion of piety and learning generally. From these funds the salaries of tutors are drawn; and these salaries lessen the expense of education to the students. It is then an eleemosynary, and, as far as respects its funds, a private corporation. . . .

"That education is an object of national concern and a proper subject of legislation, all admit. That there may be an institution founded by government, and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to government, none will deny. But is Dartmouth College such an institution?" The conclusion was reached that it was a private eleemosynary institution and incapable of change without its consent by the legislature, but it was conceded that if it had been a public corporation created for governmental purposes, the power to alter, amend or change the charter was unquestionable.

Mr. Justice STORY, in a concurring opinion, conceded that if the power to control, alter or amend the charter was reserved in the charter itself, no doubt could exist as to that power. Accordingly the various legislatures have since that decision availed themselves of this suggestion and either inserted this right in general laws made applicable to all charters or incorporated it in subsequently granted special charters, in the charters themselves. [Pennsylvania College Cases, 13 Wall. loc. cit. 213; Miller v. State, 15 Wall. 478; Shields v. Ohio, 95 U. S. 319; Railroad v. Maine, 96 U. S. 499; Sinking Fund Cases, 99 U. S. 700; Railroad v. Georgia, 98 U. S. 359; Greenwood v. Freight Co., 105 U. S. 13; Spring Valley Water Works v. Schottler, 110 U. S. 348.]

"Private charters or such as are granted for the private benefit of the corporators are held to be contracts because they are based for their consideration on the liabilities and duties which the corporators assume by accepting the terms therein specified." [Penn. College Cases, 13 Wall. 214.]

Strained as the construction was in the Dartmouth College case, no such state of facts exists in this case.

Watson Seminary was not endowed by private individuals. Not a dollar of the funds which the Seminary now demands is the gift of any private individual to this seminary. So much of said fund as originated in the will of Samuel Watson was bequeathed to raise a fund in aid of the free public schools of Pike county, when such schools should afterwards be established, and it would be an obvious misappropriation of said fund to apply it to an institution like Watson Seminary, which is not in the meaning of said will, a free or public school.

Outside of this donation the record shows that the remainder of said fund has resulted from the addition to it of "the penalties, fines and forfeitures," public funds, which have accrued to said county under the operation of the public laws of the State.

Looking further into the charter of this corporation, we find there were no private incorporators, share or stockholders and no shares of stock which an individual could hold. Whatever may be said of those charters granted to private persons for private benefit, the reasoning can have no application here. Here the State *ex mero motu* has created a corporation for a public purpose, that of education, and has provided for it out of public funds, to wit, "the penalties, fines and forfeitures," accruing to a subdivision of the State, to wit, Pike county, and the State through its own public servants, the county court, appoints its own agents or mandataries to administer that trust. Under the scheme the control of the State is perpetuated as long as the charter is

effectual. To hold such a charter with such limitations a contract, would be to disregard all fundamental distinctions of the law. At least two parties are essential to a contract. "A contract is an agreement between two or more competent parties for a valuable consideration, touching a lawful subject-matter." 4 Minor's Institutes, p. 16.

In this case, if a contract, it is equivalent to saying the State has contracted with itself or its own agencies and creatures, a solecism in·the law. Our conclusion is that the Dartmouth College case can not control because this is not a private but a public corporation, created and founded by the State, and placed entirely under the control of a board created by the State, to dispense a purely public fund, and responsible and amenable exclusively to the State and its subdivision, the county of Pike. It necessarily follows that as no contract was ever entered into by the State with any second party, it can not in the nature of things be impaired by any subsequent amendment or alteration of said charter.

II. But if we are wrong in our interpretation of the charter of this corporate body, another insuperable difficulty lies in the way of granting plaintiff a peremptory writ of mandamus against the county court.

The general law of Missouri applicable to corporations at the time this charter was granted in 1847 provided among other things that "the charter of every corporation that shall hereafter be granted by the Legislature, shall be subject to alteration, suspension and repeal, in the discretion of the legislature." [R. S. 1845, chap. 34, art. 1, sec. 7, p. 232.]

We have already adverted to the fact that the States and the courts alike seized upon the qualification of the doctrine of the Dartmouth College case, to wit, that when a provision was inserted, either in the charter itself, or a general statute governing all such charters reserving the right·to amend, alter or repeal the charter, such reservation is a condition of the grant, and its subsequent exercise is in no sense an impair-

ment of the obligation of the contract.    [Railroad v. Railroad, 14 Ga. 327.]

When the charter under consideration herein was granted, the provision of the Revised Statutes of 1845 became, to all intents and purposes, as much an integral part thereof as if it had been written therein in so many words.

To parry the force of this well-nigh universal construction, counsel for the seminary argue that while this is true, it is also indisputable that as the general law of 1845 was only a legislative enactment it could not bind subsequent legislatures, and prevent their granting charters which were not subject to this amendatory reservation and power.    This is true, but where in this charter is there an intimation that the State had voluntarily denied itself this power of amendment and alteration?

The negation of this reserved power is certainly not to be found in any express provision of the charter, taking it out of the general right reserved to the State, nor are there such words as necessarily imply such an intention.

Nor are we called upon to give a strained construction of exemption from the general law in favor of this gratuity granted to this corporation.    It is a well settled rule of construction of grants by the legislature to corporations whether public or private, that only such powers and rights can be exercised under them as are clearly comprehended within the words of the act or derived therefrom by necessary implication regard being had·to the object of the grant.    Any ambiguity or doubt arising out of the terms used by the legislature must be resolved in favor of the public.    [Fanning v. Gregoire, 16 How. (U. S.) 534; Minturn v. Larue, 23 How. (U. S.) 435; Carroll v. Campbell, 108 Mo. 550.]    Mr. Justice SWAYNE declared, in Fertilizing Co. v. Hyde Park, 97 U. S. loc. cit. 666, and in Newton v. Commissioners, 100 U. S. 548, "Nothing is to be conceded.    The affirmative must be shown.    Silence is negation and doubt is fatal to the claim."

To construe this act as sought by plaintiff would be to deprive Pike county forever of the funds granted by the Constitution of the State for the support of its public schools (Constitution, art. XI, sec. 8); to deprive that county of a privilege granted to every county in the State.

The act of March 12, 1859, expressly repealed so much of the charter of Watson Seminary as granted "the fines, forfeitures and penalties" accruing to Pike county to said seminary, and in view of the reserved right to so amend said charter in the Revised Statutes of 1845, we have no doubt of the constitutionality of this act of 1859.

The contention of counsel that because the revision of 1855 did not in words continue the general law of 1845 though the same provision is found therein [Revised Statutes 1855, chapter 34, article 1, section 7, page 371], it is only necessary to say that the subsequent repeal, if conceded, did not affect the right to amend which to all intents and purposes was incorporated in the charter at the time of enactment. [Freehold Mut. Loan Ass'n v. Brown, 29 N. J. Eq. 121; United Hebrew Ben. Ass'n v. Benshinol, 130 Mass. 325; Beer Co. v. Massachusetts, 97 U. S. 25.]

But regardless of the reserved right of the legislature to amend the charter as it did by the act of 1859, in view of the fact that there are no incorporators of Watson Seminary outside of the State itself, its sole benefactor, we think it is perfectly clear that this corporate body has no standing to complain of the action of the State in the amending or repealing act.

The persons who gave the land and contributed money to build the schoolhouse are not before this court, and are not represented. They had no voice in creating the board of directors. They were no parties to any contract if one ever existed, between the State and its own appointees, not one of whom has the slightest pecuniary interest in the school. [Hagar v. Reclamation Dist., 111 U. S. 701.]

We are not called upon to decide or determine the rights of persons who contributed to the school property. It is not our duty to decide any constitutional question affecting their rights, until they are in court and the issue is directly or necessarily involved. [People v. Railroad, 89 N. Y. loc. cit. 92.]

Finally we come to consider whether the grant of the fines, penalties and forfeitures accruing to Pike county was such that it became upon its passage irrepealable. Said Chief Justice MARSHALL in the Dartmouth College case (p. 629): "If the funds of the college be public property, or if the State of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the State may act according to its judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States." The same principle was repeated in East Hartford v. Hartford Bridge Co., 10 How. 511, and Butler v. Pennsylvania, 10 How. 402.

In Newton v. Commissioners, 100 U. S. loc. cit. 559, the Supreme Court of the United States discussed the act of Ohio providing for the removal of the courthouse of Mahoning county from Canfield to Youngstown. By the act of 1846, upon certain condition complied with by the people of Canfield, the courthouse was "permanently established" at said place. In 1844 the legislature passed the act of removal, and it was resisted as impairing the obligation of a contract, but the court held the first act was not a contract, was not irrepealable because the provisions for holding courts were public things, and laws concerning them must be of the same character. Said the court: "They involve public interests, and legislative acts concerning them are necessarily public laws. Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of repeal and modification which the former had of enactment, neither more nor less."

Now "fines, forfeitures .and penalties" accrue to the State from the violation of some obligation to the State, or as the result of criminal prosecutions for offenses against the State. Each legislature may repeal the laws creating these and enact new laws imposing other and different ones. The whole subject is a matter absolutely in the power of each succeeding legislature acting in its relation to public objects. No person or institution can have a vested right therein. Hence when the legislature granted the fines, forfeitures and penalties, then in the county treasury, in 1847, it did so subject to the right of the next legislature to repeal the act of 1847.

In the very nature of the subject-matters granted, and the public purpose to which they were devoted, there was not and could not be an absolute and unchangeable contract which future legislatures might not modify or repeal, but it was a gratuity or privilege, without any consideration, moving to the State, which could be revoked at any time as was expressly done in 1859. [State v. Gilmore, 141 Mo. 506; Newton v. Commissioners, 100 U. S. loc. cit. 561; Christ Church v. County of Philadelphia, 24 How. 300; State v. Julow, 129 Mo. loc. cit. 177.]

Upon a full consideration of all the facts we are satisfied that there was no contract because there were no parties to the act creating and endowing the school ·but the State itself, and no consideration moved to the State for the grant of the funds, and that the State had the reserved power under the general law of 1845 to amend, alter or repeal the act without infringing any constitutional right; and without reference to this right, the matter being one of public concern in which the State alone was interested, the legislature had a perfect right to act in regard to it according to its own judgment, and was in no way restrained by the Constitution of the United States.

The judgment is affirmed. SHERWOOD and BURGESS, JJ., concur.