J. J. SNOUFFER, JR., Appellee, v. CEDAR RAPIDS AND MARION CITY RAILWAY COMPANY, Appellant; AND CEDAR RAPIDS AND MARION CITY RAILWAY COMPANY, Appellant, v. THE CITY OF CEDAR RAPIDS, IOWA, J. J. SNOUFFER *et al*, Appellees.

|118   387|
|126   238|

Streets: DEDICATION OF ADDITIONAL LAND : RIGHTS OF STREET RAIL-
1    WAY COMPANY.    Where abutting property owners dedicate additional land for the purpose of widening a street, such land becomes a part of the thoroughfare when so recognized and

used, although there was no formal acceptance of such dedication by the public.   And a street railway company constructing its road on such additional land can claim no rights adverse to the general public, even though the abutting property owners subsequently grant to the railway company the right to so ·construct its road.

Ordinance; REPEAL OF: VESTED RIGHTS UNDER.   Generally speaking, the power of a city council to repeal an ordinance is as broad as its power to enact; however, rights may be acquired under an ordinance which cannot be taken away without compensation.

Streets: CONTROL OF CITY OVER: REASONABLE EXERCISE OF.   Control and improvement of streets is a legislative power vested in the city, and the reasonable exercise of this power cannot be abrogated or relinquished by ordinance or contract where the public convenience and safety forbid, and the presumption is in favor of the reasonable exercise of such power.

Street Railway: USE OF STREETS: MUNICIPAL REGULATION.   A legislative act may authorize the use of a highway for street railway purposes, still such use is subject to a reserved power to enact all reasonable measures to protect the public in the use of such highway for all purposes for which highways are established, and when such highway is brought within the jurisdiction of a municipality, such street railway becomes an occupant of a city street and is subject to municipal regulation.

Municipal Authority: REASONABLE EXERCISE OF.   To require a street railway company to remove its tracks to the middle of the street, place the same at grade and pave the portion of the street it occupies, is a reasonble exercise of municipal authority.

*Appeal from Linn District Court.*—HON. WM. G. THOMPSON, Judge.

TUESDAY, OCTOBER 28, 1902.

THE case is stated in the opinion.—*Affirmed.*

*Chas. A. Clark & Son* and *Wm. G. Clark* for appellant.

*John M. Hughes* for appellee City of Cedar Rapids. *Heins & Heins* and *Hubbard, Dawley & Wheeler* for appellee J. J. Snouffer, Jr.

WEAVER, J.—The facts essential to an understanding of this controversy may be stated as follows:

For many years prior to 1879, a public highway connected the cities of Cedar Rapids and Marion. Beginning as early at least as the year 1874, the property owners along that portion of said route now under consideration dedicated or attempted to dedicate additional land to the public for the use of said highway, making it 120 feet in width, and as thus enlarged such highway was thereafter known as "The Boulevard" and later as "First Avenue." In the year 1879, a corporation formed for that purpose undertook the construction between the two cities of a street railway to be operated by animal or motor power, and to lay the same within the boundaries of said highway as enlarged by the dedications above mentioned. In furtherance of this purpose the property owners along the route, or many of them, in May, 1879, signed a written instrument, the body of which is as follows: "We, the undersigned property owners on the boulevard between Cedar Rapids and Marion hereby consent, grant, and assign right of way. for the purpose of a street railway between the said cities of Cedar Rapids and Marion on and upon said boulevard to the Marion and Cedar Rapids Improvement Co., said railway to be in operation in one year from May 1st, 1879;, otherwise our permission as above to be null and void." Just when the railway was completed is not entirely clear, but probably in the spring or summer of 1880; the track being laid within the 120 feet aforesaid, but near the southern boundary thereof. March 12, 1880, the legislature of the state passed an act, which, while general in form, bears evidence of having been framed with special reference to this enterprise. That portion of said act having any bearing upon the result of this case is as follows: "Section 1. That any street railway company now or

VOL. 118 IOWA.—19.

hereafter organized under the laws of this state to operate a street railway in any city or incorporated town in this state, for the purpose of extending its railway beyond the limits of such city or town, may locate, build and operate either by animal or motor power, its road over and along any portion of a highway which is of a width of one hundered feet or more. In such cases said company, as soon as practicable, shall put said highway in as good repair and condition as the same was before its use for the purpose herein contemplated; and boards of supervisors are herein authorized to accept for highway purposes under this act, conveyances of land adjoining any highway or part thereof sufficient to increase said highway to the width of one hundred feet." Acts 18th General Assembly, chapter 32. At this time that part of the enlarged street where plaintiff Snouffer now resides was outside of the corporation limits of Cedar Rapids, and was not annexed to said city until December 8, 1834. In January, 1881, the board of supervisors of Linn county passed a resolution declining "to accept any conveyance or dedication of land adjoining the highway between Cedar Rapids and Marion." In July, 1881, one S. C. Bever, being the owner of the property bordering on said highway between what are now known as "Fifteenth" and "Eighteenth" streets of the city of Cedar Rapids, and including the tract now owned by the said Snouffer, made and filed in the proper office a plat and instrument of dedication, making the street in question 120 feet wide. It would seem, however, that this dedication must be regarded as confirmatory of an actual or attempted dedication made at some earlier date, for, as we read the testimony, the street had been generally recognized as of the full width of 120 feet, long prior to the filing of said instrument. The railway was operated by the company constructing it, though under a varying name, until September 29, 1891, when it sold and assigned its property and franchises to the present owner. May 1.

1891, the city of Cedar Rapids granted to a corporation known as the Thompson-Houston Electric Company an exclusive franchise for the construction and operation of an electric railway in said city, upon such streets as should be indicated by said corporation in accepting said grant, but requiring that among the routes to be selected should be one leading from the business portion of Cedar Rapids to the northeastern limits of the city. June, 9, 1891, the Thomson-Houston Company accepted the franchise, and designated First avenue, or the boulevard, as the route selected between the business portion of the city and the northeastern limits of the incorporated territory. Thus, it will be observed, the new or electric line as designated was made to occupy the same street with the Cedar Rapids & Marion Motor Line. By the terms of the grant the Thomson-Houston company bound itself to pave between the rails of its tracks and one foot in width on either side of such tracks on all paved streets upon its route, and to so lay its rails as not to interfere with the safe crossing of its lines by vehicles, and generally to so use and operate its line as not to unnecessarily impede the public travel on any street, and upon completing the construction to restore said streets to as good condition as had existed at the time of its entry thereon. It also undertook to complete the construction of the designated lines in six months, and to hold its property subject to the proper orders of the city for the improvement of its streets, and to promptly raise or lower its tracks to conform to any changes made in the grade of the streets. In January, 1892, and before the electric line of railway had been constructed upon First avenue, the Cedar Rapids & Marion City Railway Company, owner of the motor line, purchased the property, rights, and franchises of the Thomson-Houston Company, and on May 20, 1892, said purchase having been reported to the city council of Cedar Rapids, that body adopted an ordinance approving and confirming said transfer, and

declaring that all of the rights and franchises theretofore
granted to the Thomson-Houston Company "are hereby
granted, confirmed, and vested in the Cedar Rapids &
Marion City Railway Company, subject, however, to all
the terms, conditions, limitations, and liabilities con-
tained" in the original grant. Upon obtaining this fran-
chise, the Cedar Rapids & Marion City Railway Company
adopted and thereafter used electicity as the motive power
for operating all its lines, both those it had formerly oper-
ated by animal or steam motor power and those acquired
by purchase. It also proceeded to construct and equip the
several lines left unfinished by its grantor, except upon
First avenue, where, instead of putting in a new track, it
made use of the track of the old motor line, situated, as
we have already stated, near the south boundary of said
street. On March 8, 1895, while the Cedar Rapids & Mar-
ion City Railway Company were still using the track of the
old motor line on First avenue for the operating of electric
cars, the city council of Cedar Rapids enacted an ordi-
nance known in the record as "No. 409," and around
which much of the contention in this case centers. Said
ordinance provided, in effect, that the 120 feet of First
avenue should be improved upon the following plan:
Twenty-five feet upon each side of said avenue was ordered
set apart for parking, and twenty feet in the middle of
the street devoted to the use of the street railway com-
pany, which was ordered to remove its line from the south
side of the avenue to the twenty-foot strip above men-
tioned, and to construct a double track thereon. A curb
was to be erected at the border of the parking, also along
either border of the twenty-foot space above mentioned,
and the space between the curb lines was eventually to be
paved; but the strip to be occupied by the railway as
aforesaid was to be "ballasted with rock," except at street
crossings, which were to be planked. The curb was to be
twelve inches in depth, and the twenty-foot strip, when

improved according to said plan by setting the curbs and ballasting between them, would be elevated above the adjacent paving by several inches. The net result of this improvement, if completed, would be two parallel paved roadways of twenty-five feet each, separated by a twenty-foot strip carrying the railway tracks, and ballasted with stone to a height which would render crossing the same with carriages impracticable except at street intersections. The last section of said ordinance provides that it shall take effect from its acceptance in writing by the railway company, and declares the intention to be that the company shall have the same right in the new location provided for it as it then legally possessed in the old location, subject only to the limitations expressed in such ordinance, and that, on the change being made, all rights of the company in the old location should cease. After the passage of Ordinance No. 409 in March, 1895, neither the city nor the railway company took action thereunder, and the company continued to operate its line on the old location for more than six years. In the spring of 1901 a proposition to repeal said ordinance was pending before the city council, but, before the matter was finally disposed of, the railway company began, or attempted to begin, the construction of a new double track in the middle of the avenue in front of the property of the plaintiff Snouffer, with the avowed purpose of making and improving such location in accordance with said Ordinance No. 409. On June 6, 1901, Snouffer began the suit first above entitled against the railway company and the city, alleging that the railway, as it was being constructed, was a nuisance, and that Ordinance No. 409 was unreasonable and void, and asking to enjoin such construction. On the 21st of June, 1901, the city council passed an ordinance repealing Ordinance No. 409, and soon thereafter, by another ordinance and resolution, ordered the railway company to move its track from the side to the middle of the street, and in such reconstruction to

make the surface of its road and track conform to the grade
of the street, in such manner as would permit the pass-
age of teams over and across the same. On June 29, 1901,
the railway company began its action, the second above
entitled, making the city, its mayor and council and
Snouffer defendants, setting up its alleged rights under
Ordinance No. 409 and under the original franchise granted
to the motor line, and asking that its right to construct its
track in accordance with the terms of said ordinance be
established and confirmed, and that defendants be enjoined
from interfering therewith. By answer and cross-petition
setting up the facts heretofore stated the city asked a de-
cree requiring the railway company to move its tracks to
the middle of the street, and to place the same upon the
grade of the street in accordance with its order last above
mentioned. All the issues taken upon these various de-
mands were consolidated for trial. The decree of the
district court denied the relief asked by the railway com-
pany, and dismissed its petition, and ordered the company
to place its tracks in the middle of the street, and to do
the paving between the rails and one foot on either side
of the tracks. The railway company appeals. This ted-
ious statement, condensed from the pleadings, which make
over eighty pages of printed matter, has seemed necessary
to a fair understanding of the several claims of the parties
and the manner in which their alleged rights have had origin.

I. In its original pleading the railway company al-
leged that prior to the vesting of any right in itself the
highway between Cedar Rapids and Marion was at all
points 100 feet wide, and that at the time its
line of road was located the highway at the
point involved in this litigation was of the un-
iform width of 120 feet or more, and that its
track was located thereon under the act of the legislature
hereinbefore referred to. Subsequently this allegation
was withdrawn, and it was alleged that, the dedication by

1. STREETS: ded-
cation of ad-
ditional land:
rights of street
railway Co.

the adjacent owners not being accepted by the county, the true width of the street was but 66 feet, and that the right of way occupied by the company was derived primarily by grant from the owners as a right of way over private property. This proposition cannot be sustained. · It is quite clear that when the project of constructing the railway was first conceived all parties concerned, relying upon the voluntary action of the owners of abutting lands in dedicating or attempting to dedicate the additional width to the use of the public, believed and understood that the highway at this point was 120 feet wide and that it was "at all points" of the route between the two cities not less than 100 feet wide. Evidently on the theory that the consent of the abutting owners was all which was necessary to authorize the use of the street for the railway, the corporation obtained such consent in writing. The language employed in the instrument is very significant: "We, the undersigned property owners on the boulevard between Cedar Rapids and Marion, hereby consent, grant, and assign right of way for the purpose of a street railway between said cities of Cedar Rapids and Marion on and upon said boulevard," etc. As illustrating the force of the words "on and upon" in this connection, see *Heath v. Railway Co.*, 61 Iowa, 14. This writing can be reasonably interpreted and explained upon no theory except the recognition of the boulevard as a public st·eet by all the parties to the transaction. Thereafter, and while the railway was yet in the course of construction, this court had occasion to decide that, in the absence of statute, the occupation of a street by a railway operated by motor power is unauthorized. *Stanley v. City of Davenport*, 54 Iowa, 463; *Stange v. Railroad Co.*, 54 Iowa, 669. Stimulated, no doubt, by these decisions, resort was had to the legislature, which established and confirmed the right of this railway company to the use of the boulevard by enacting that "any street railway company now or hereafter organized,

*   *   * for the purpose of extending its railway beyond
the limits of such city or town, may locate, build, and
operate, either by animal or motive power, its road over
and along any portion of a highway which is of a width of
100 feet or more." This statute was the subject of judicial
interpretation very soon after its passage. While the
railway was still in the course of construction, Linn county
brought an action to enjoin the company's use and occupa-
tion of this highway. Injunction being refused, the county
appealed to this court. The position then assumed by the
company was that the street was 120 feet wide, and its
occupancy thereof was, therefore, under the protection of
the statute. That position was sustained, the court, in its
opinion, saying: "The statute above quoted contem-
plates the existence of highways of 100 feet or more. Un-
less such highways may exist, the statute would be inoper-
ative. It must, therefore, be interpreted as authorizing
them. The boulevard, as a highway of 120 feet in width,
is therefore legalized by the act above quoted, which also
legalizes the railroad constructed along it."

But it is urged that the board of supervisors refused
to accept the dedication of the extra width of street. We
think, however, that fact is not necessarily decisive of the
legal existence of the boulevard. The dedication of a street
may be accomplished without any deed or formal act by the
dedicator, and without any formal declaration of acceptance
by the public authorities. *Morrison v. Marquardt*, 24
Iowa 35; *Fisher v. Beard*, 32 Iowa, 346; *Mosier v. Vincent*,
34 Iowa, 479; *Getchell v. Benedict*, 57 Iowa, 121; *Mander-
schid v. City of Dubuque*, 29 Iowa, 73; *Gear v. Railroad
Co.*, 39 Iowa, 23; *Bayliss v. Supervisors*, 5 Dill. 549 (Fed.
Cas. No. 1,142). The dedication may be shown by the ver-
bal declarations of the owner, by his act in filing the plat,
by his silence in the face of known adverse possession by
the public, or by any other act or omission from which the
intention to dedicate may fairly be inferred. Acceptance

may also be inferred from general use of the way by the public, or by the improvement and repair of the way by the authorities having care and control of the highways. The owners of abutting property may also devest themselves of all title in favor of the public by laying out a street and selling lots or parcels of land with reference thereto, and this rule is not subject to any acceptance by the public generally or by the authorities. *Shea v. City of Ottumwa*, 67 Iowa, 39; *City of Pella v. Scholte*, 21 Iowa, 463. In the present instance it is well proven that the existence of the boulevard as a street or highway 120 feet wide, devoted to the public use, has been recognized since a time some years before the railway company acquired any rights therein; that improvements have been made with reference thereto; that the very acts by which the company obtained permission to use said right of way, and the statute which confirmed and legalized such occupancy, implied an admission of the public character of the boulevard; that the actual use of said boulevard as a public way has been continuous, and that until the commencement of this controversy there has been nothing in the conduct of the railway company to indicate any claim of right or title to its location other than is acquired by street railway companies generally in streets over which their lines are operated. We think, therefore, that the boulevard on First avenue must be considered as a public street of 120 feet in width from a date anterior to its occupation for railway purposes, and that the fact, if it be a fact, that no part of the railway track is within the limits of the original 66 feet of said way, is immaterial in determining the rights of the parties in this litigation.

II.   Much argument has been submitted upon the validity of Ordinance No. 409, and upon the power of the city generally to enact ordinances of that nature. In view of the conclusion we have reached that the judgment of the district court may be affirmed upon another proposition,

we will not undertake at this time to pass upon the questions thus raised farther than to say that, whatever may be the powers vested in the city governments in this respect, they must not be exercised arbitrarily or unreasonably.

III.    Generally speaking, the power of the city council to repeal an ordinance is no less broad than its power to enact, though it is true that rights may have been ac-

2. ORDINANCE: repeal of: vested rights under.

quired under such ordinance which a repeal cannot destroy or impair.    Ordinance No. 409, under which the railroad company claims its right to appropriate the use of 20 feet in the middle of First avenue, and exclude the public therefrom, was repealed in June, 1901.    It had been in existence more than six years.    During that period the railway company had made no attempt to exercise any rights under it, or to expend any time or money upon the strength of its provisions, until the matter of repeal was being agitated in the council; and we think it may fairly be said the effort then made by the company was colorable only, and ought not to operate to deprive the city of its power to annul the measure which for six years had stood a dead letter upon its ordinance book.

Moreover, it must be remembered hat the control and improvement of its streets are vested in the city, and that the right of the railway company in the streets is subordinate to this power and authority in the municipality.    *City of Detroit v. Railroad Co.* (Mich.) 51 N. W. Rep. 690; *State v. Railroad Co.* (Minn.), 81 N. W. Rep. 201; *Lake Roland El. Ry. Co. v. City of Baltimore*, 77 Md. 352 (26 Atl. Rep. 510, 20 L. R. A. 126). This power of the city cannot be abrogated by ordinance or relinquished by contract.    It is inde-

3. STREETS: control of city over: reasonable exercise of.

feasible.    In *State v. Graves*, 19 Md. 351 (81 Am. Dec. 639), the court says: "The mayor and city council are but trustees of the public. The tenure of their office impressed their ordinances with liability to change.    They could not, if they would, pass

an irrevocable ordinance.    The corporation cannot abridge
its own legislative powers. ''    We are cited by appellant to
*City of Burlington v. Burlington St. Ry. Co.*, 49 Iowa,
144, where we held the city not authorized, under the facts
there shown, to amend a street railway ordinance abridg-
ing a right formerly granted.    The reason for that decision
is explained in the opinion by the statement that there
was no allegation or claim that public convenience or ne-
cessity required the proposed amendment, and no showing
that the work as originally authorized would create any nui-
sance, or work any injury to the city or any citizen.    More-
over, no question was there made as to the power of the
city to enact the ordinance sought to be amended.    Here,
however, these points are all raised.    It is shown that the
carrying into effect of the provisions of Ordinance No. 409
would for all practical purposes convert the boulevard into
two narrow ways separated by a barrier impassable to
teams, thus compressing the driveway available to an ad-
jacent residence into a paved path of 25 feet, in which a
team could not be conveniently or safely turned, especially
in the presence of rapidly moving cars.    That such a plan,
carried into operation, would not only obstruct the public
in the use of a street which is conceded to be an important
and much-frequented thoroughfare, and that the result
thereof would be detrimental to the use and value of the
abutting property, is very apparent; and to enforce such
regulations may well be said, under some circumstances,
at least, to be an unreasonable exercise of municipal power.
*Lake Roland El. Ry. Co. v. City of Baltimore*, 77 Md.
352 (26 Atl. Rep. 510, 20 L. R. A. 126), above cited, is an
instructive case, and discusses this phase of municipal
authority with a clearness of reasoning which gives much
weight to its decision.    The city of Baltimore by ordinance
gave the street railway permission to lay a double track
on Lexington street, but thereafter repealed the ordinance,
and modified the privilege to the use of a single track on

conditions named. There, as here, the railway company expended no money in laying its track until after it was aware that the ordinance was about to be repealed. There, as here, it was contended that the ordinance was in the nature of a contract with the company, which could not be impaired by repeal. After a very full examination of the authorities and statement of the manner in which the railway as authorized by the ordinance obstructed the convenient use of the street, the court says: "The control of the city over the streets is attended with a duty of preserving them for their legitimate purposes. They are intended for the passage of the people over them on foot, on horseback, and in vehicles on their various occasions of business, convenience, and pleasure. It is not competent for the city to defeat the primary purposes for which they were dedicated to the public use. They are highways, and must be maintained as highways, so long as they are kept in existence. The power over the streets is held in the same trusts as other legislative powers conferred on the mayor and city council. It is intended to be used for the purpose of preserving them in the character of streets in such condition as to be most suitable for the public use. It is of incalculable importance to the public interest, and there can be no more reason to suppose that the city can abridge or surrender this legislative power than any other. * * * If an ordinance cannot be repealed which will reduce Lexington street to the condition we have described, then truly the city council have lost control over the streets, and have renounced their legislative power; and it will be demonstrated that they have the power to destroy their utility for the legitimate purposes of streets, and to convert them into places of extreme peril to life and limb, but not the power to keep them in a condition suitable for their ordinary use as highways. Our municipal governments were not instituted for the purpose of making any such result possible. The repealing ordinance was passed because, as stated in the preamble,

the city council thought it was required by the public safety and convenience and the proper regulation of the use of the streets. These considerations for the repeal were within the legislative judgment and discretion, and the evidence shows that the ordinance has a real and substantial relation to the objects proposed. It is therefore not subject to supervision or review by the courts. This legislative authority over the streets, delegated to the city, is sometimes classified as belonging to the police power; that is to say, that great power which embraces the protection of life, limb, health, and property, and the promotion of the public peace and safety. It is a high conservative power of the utmost importance to the existence of good government. It has been most emphatically declared by the supreme court of the United States that a state cannot limit its exercise of this power by contract or in any other way. Some of the best known and most striking cases are *Stone v. Mississippi*, 101 U. S. 814 (25 L. Ed. 1097); *Boston Beer Co. v. Massachusetts*, 97 U. S. 25 (24 L. Ed. 989), and *Northwestern Fertilizing Co. v. Hyde Park*, 97 U. S. 659 (24 L. Ed. 1036). But supposing this designation not to be appropriate in the present instance, the name given to the power is of no importance. It is expressly conferred by the legislature." Upon a rehearing, Alvey, C. J., adds a supplemental opinion, which is in part as follows: "The mayor and council, by the statutory provision, are invested with express authority to regulate the use of the streets, lanes, and alleys of the city by railway or other tracks; and this, as I understand it, is but an amplification of their general power over, and right and duty to regulate and maintain, streets and other highways of the city for the use of the public. * * * This power to maintain and regulate the use of the streets of the city is a trust for the benefit of the general public, and the primary use of the streets is not by any means that of furnishing tracks for street railways. The mayor and city council cannot

devest themselves of this trust, nor can they so restrict their power over the streets as to defeat or seriously impair the beneficial enjoyment of the streets by the public in the ordinary and usual modes of passage thereon. The power vested in them in respect to the streets is of a legislative character, and they cannot restrict themselves nor their successors by any irrepealable ordinance in the exercise of such power over the streets, except it be by the express authority of the legislature of the state. The power is a continuing one, to be exercised whenever the public needs may require it, and hence the power to regrade and improve the streets from time to time must remain subject to the judgment and discretion of the legislative branch of the municipal government. But, if the contention of the appellant could be maintained, the streets on which railway tracks are once laid might, and most generally would, pass out of control of municipal authority; for, however improvident or reckless might be the grant of privileges to street railway companies, or however much their tracks might obstruct the use of the streets by the general public, perpetual easements or servitudes would be created in the streets, and the municipal authorities would be precluded from the exercise of the ordinary power of changing grades or making other improvements that might materially interfere with the tracks or the opperation of the road, though public necessity for such improvement might be never so urgent; and in such case the only means of reclaiming the street to the absolute control of the city authorities, and to the general public use, would be by resort to the power of eminent domain." Further answering an objection which is also urged in the present case, the opinion continues: "I am aware that it may be urged (and it constitutes the full strength of the appellant's case) that upon the principles I have stated as the grounds of my judgment the e would be no sufficient protection to the property rights in a street railway. I am

far from saying that such property rights are not entitled to protection.  If, in reliance upon a valid ordinance, a railway company, in good faith, and without notice that the authority is about to be modified or withdrawn, has laid its tracks in the streets of a city, and the municipal authorities conclude afterwards that the grant of the privilege was improvident, or detrimental to the public, and require the tracks to be removed, this can be enforced only upon the principles of fair indemnity to the company. This is in accord with a well-established principle in the case of an executed license, where, to entitle the licensor to revoke the license and to be restored to his former rights, he must do justice to the licensee by indemnifying him for the expense which he has reasonably incurred under the license, but not for prospective profits that might be realized.  This measure of indemnity the principle of justice would seem to require in such case as I have just stated."

The case of *State v. St. Paul City R. Co.*, (Minn.) 81 N. W. Rep. 200, is also in point.  The railway company, acting under an ordinance of the city, had constructed and was operating a system of street railways.  Thereafter the city ordered a material change in the manner of operation. This was resisted by the company on the theory that the original ordinance was a contract and that the later ordinance was an attempt to impair the obligations of such contract.  The trial court held with the company, but its judgment was reversed on appeal.  We quote from the opinion:  "The trial seems to have been conducted upon the theory that the ordinance or franchise was to be construed precisely as if it was a contract between two private individuals.  This, however, is a too narrow, and even erroneous, view of the case.  We shall assume, without discussion, that Ordinance No. 1,227 contains a valid contract between the city and the railway company, the obligations of which the former cannot impair.  But this

proposition is subject to the following qualification: Among the governmental powers vested by the charter in the city council is the care, supervision, and control of streets and highways. Without attempting to define. the extent or limit of the powers thus granted, it unquestionably gives the common council authority to enact such police regulations regarding the use of streets as are necessary for the safe and convenient enjoyment of them by the public for the purposes for which they are designed. It is fundamental that a municipality cannot, at least without express legislative authority, deprive itself by contract of any governmental powers conferred upon it for public purposes. Hence any authority to use the streets granted to defendant must be construed as being subject to the police power of the city over the streets, whatever may be the language of the grant. For example, if, by reason of increased traffic on the streets prescribed for the construction of the loop, or for any other reason, the use of those streets becomes inconsistent with the convenient use of the streets by the public, or a menace to the safety of the public, it would, in our opinion, be unque tionably within the police power of the city to enact an ordinance requiring the loop to be changed to some other location. In short, while a municipality cannot impair its contract under the guise of exercising its police power, it cannot surrender or barter away its police powers under the guise of making a contract." In *Flynn v. Water Co.*, 77 N. W. Rep. 38, the same court says: "The power of municipal authority to contract in relation to a given matter does not carry with it by implication the power to make a contract, even with reference to such matter, which shall cede awa , control, or embarrass their legislative or governmental powers, or render the municipality unable in the future to control any municipal matter over. which it has legislative power." In a Michigan case—*City of Detroit v. Ft. Wayne & E. Ry. Co.*, 51

N. W. Rep. 688—it is said: "These powers are held in
trust for the public benefit. They cannot be surrendered
or delegated to private parties. All franchises granted or
contracts made with reference to the use of the streets
must be made not only with due regard to their lawful
and proper use by others, but subject to the exercise by
the municipality of the powers referred to." In further
support of the principles announced by these precedents,
see Dillon, Municipal Corporation (4th Ed.) section 97;
Elliot, Roads & St., sections 760-858; *Rittenhouse v. City
of Baltimore*, 25 Md. 336; *Henderson v. Railroad Co.*
(Utah) 26 Pac. Rep. 288; *Telegraph Co. v. Hess*, 125 N.
Y. 641 (26 N. E. Rep. 919., 13 L. R. A. 454, 21 Am. St.
Rep. 764); *Newton v. Mahoning Co.*, 100 U. S. 548 (25 L.
Ed. 710); *State v. City of Hoboken*, 41 N. J. Law, 71; *Wat-
son Seminary v. Pike County Court*, 149 Mo. 72 (50 S. W.
Rep. 880, 45 L. R. A. 675); *Illinois Cent. R. Co. v. Illinois*
146 U. S. 387 (13 Sup. Ct. Rep. 110, 36 L. Ed. 1018). If,
therefore, for the purposes of the argument, we should
assume Ordinance No. 409 to have been a reasonable and
valid exercise of municipal authority, and to constitute a
contract between the city and the railway company, it was
still competent for the city to repeal or modify the privi-
lege granted, whenever, in the exercise of a reasonable
discretion, it should find that the convenience and safety
of the public or the proper improvement of the street re-
quired it. As already suggested, and as has been often
decided, this power may not be exercised unreasonably.
And this is the extent to which most of the cases cited by
appellant on this point may be claimed as authority,—for
example: *City of Burlington v. Burlington St. Ry. Co.*,
49 Iowa, 144; *Des Moines City Ry. Co. v. City of Des
Moines*, 90 Iowa, 773; *Northwestern Tel. Exch. Co. v.
City of Minneapolis*, (Minn.) 86 N. W. Rep. 74, 53 L. R.
A. 175. Of the latter case, however, it should be said

that, as determined upon rehearing, the decision was by a divided court; the holding of the majority that the city could not lawfully order the telephone poles removed, and the lines placed in an underground conduit, being largely based upon an act of the legislature authorizing telegraph and telephone companies to carry their lines on poles planted in the highway. The burden is not cast upon the city to show that its exercise of legislative power is reasonable. The presumption is in favor of its reasonableness. *Paxson v. Sweet*, 13 N. J. Law, 196; *State v. Inhabitants of City of Trenton*, 53 N. J. Law, 132 (20 Atl. Rep. 1076, 11 L. R. A. 410.) There is nothing in the record to overcome the presumption in favor of the action of the city council in repealing the ordinance.

There is an important distinction to be drawn in speaking of municipal contracts,—a distinction which has not always been duly considered by courts and law writers, but it is nevertheless fundamental, and cannot, with safety, be disregarded. A municipal corporation may be said to possess a dual character. In one capacity it is a property holder, a mere business agency, and is charged with the management of the financial and business interests of the municipality. In another capacity it is an arm of sovereignty, and is charged with legislative and governmental powers. Contracts lawfully made by it in the first capacity are as obligatory and inviolable as contracts made between private individuals; but, in the absence of statutory authority, any contract or agreement, whether in the form of an ordinance or otherwise, which directly or indirectly surrenders or materially restricts the exercise of a governmental or legislative function or power, may at any time be terminated or annulled by the municipality; though, as we have already noted, such action may, under some circumstances, involve liability for compensation to persons who have acted upon faith of the validity of such contract. The power given to cities and towns to control their streets,

direct their improvement, and regulate their use is a legis-
lative power, and comes within the operation of the rule
we have stated.    *Lake Roland El. Ry. Co. v. City of Bal-*
*timore, supra*; *Rittenhouse v. City of Baltimore, supra*;
*Telegraph Co. v. Hess*, 125 N. Y. 641 (26 N. E. Rep. 919,
13 L. R. A. 454, 21 Am. St. Rep. 764); *Goszler v. George-*
*town*, 19 U. S. 593 (5 L. Ed. 339); *Richmond County Gas-*
*light Co. v. Town of Middletown* 59 N. Y. 228; *Gaslight*
*& Coke Co. v. City of Columbus*, 50 Ohio St. 65 (33 N.
E. Rep. 292); *Bailey v. City of Philadelphia*, 167 Pa. 569
(31 Atl. Rep. 925, 46 Am. St. Rep. 691); *Springfield Fire*
*& Marine Ins. Co. v. Village of Keesville*, 148 N. Y. 46
(42 N. E. Rep. 405, 30 L. R. A. 660, 51 Am. St. Rep. 667).
In the last case cited the rule is stated thus: "When we
find that the power has relation to public purposes, and is
for the public good, it is to be classified as governmental
in its nature, and it appertains to the corporation in its
political character. But when it relates to the accomplish-
ment of private corporate purposes, in which the public is
only indirectly concerned, it is private in its nature, and
the municipal corporation, in respect to its exercise, is
regarded as a legal individual." See, also, *City of New*
*Haven v. New Haven & D. Railroad Co.*, 62 Conn., 252
(25 Atl. Rep. 316, 18 L. R. A. 256); *City of Wellston v.*
*Morgan*, 59 Ohio St. 147 (52 N. E. Rep. 127). Applying
this principle, it has been held that the city may defeat
the title of its own grantee. *Brick Presbyterian Church*
*Corp. v. City of New York*, 5 Cow. 540; *Stuyvesant v.*
*City of New York*, 7 Cow. 588.

IV.    Appellant further argues that the act of the
legislature legalizing its occupancy of the highway be-
tween Cedar Rapids and Marion served to vest the com-
pany with a legislative franchise for the
operation of its road upon the location first se-
lected, and which it continued thereafter to
occupy. If this were to be conceded, it would

4. STREET rail-
way: use of
streets: munic-
ipal regula-
tion.

not affect the question of the validity of Ordinance No. 409. It does, however, have a legitimate bearing upon the right which the city asserts under the present Ordinance No. 556 to require the company to remove its track to the middle of the street, and make it conform to the grade. We cannot agree that the legislative act has the effect to withdraw or except this company or its road from municipal control. The authority thus conferred was to construct and maintain a street railway. It did not vacate the highway, but simply made lawful an additional use of it. What is meant by a "street railway" in legislative phrase we have construed as referring "to the then known and used railways the rails of which were laid to conform to the surface of the street, and the construction of which did not of necessity exclude the public from the use of part of the street." *Freiday v. Transit Co.*, 92 Iowa, 191. While authorizing the use of the highway for this purpose, we think it must be held that such use was subject to the reserved power of the state by itself or by its local municipality to enact all reasonable measures to protect the general public in the use of the street for the primary purposes for which streets and highways are established. When, therefore, by the extension of the city limits, this portion of appellant's road was brought within the jurisdiction of municipal authority, it was neither more nor less than a street railway occupying a city street, and amenable to municipal regulation, like all other instrumentalities of its kind.

V. Appellant is in court not simply as the owner of a railway whose existence is authorized and legalized by the legislative act of 1880. It is also the assignee of

5. MUNICIPAL authority: reasonable exercise of.

the Thomson-Houston franchise, by the terms of which alone it may operate a system of electric street railways in Cedar Rapids. On obtaining possession of this franchise, it abandoned its steam motor, substituted electric motive power, and to all

intents and purposes converted the motor line within the
city into an integral part of the system which the Thomson-
Houston purchase empowered it to install.    Without re-
sort to sophistry, the right of appellant to operate its
First Avenue Line is not to be differentiated from its
right to operate any other fraction of its system within
the city limits.    As the owner of the Thomson-Houston
franchise, it holds its entire system within the city subject
not only to the express conditions upon which the fran-
chise was granted, but to the implied condition, which
enters into every grant of privilege in the public streets,
that such privilege is amenable to reasonable municipal
regulation.    Is there anything unreasonable in the demand
of the city that the appellant be required to place its track
in the middle of the street, and upon grade?    Even though
the company had never become the owner of the Thomson-
Houston franchise, and was still operating its steam motor
line on its original location, we see no reason why, under
the principles established by the authorities cited, and
under its general statutory power of regulation (Code,
sections 753-767), the city would not be authorized to re-
quire the track to be changed to the middle of the street,
and made to conform to grade.    The right which the com-
pany acquired by the statute was to operate a street rail-
way, a term the meaning of which has already been
discussed.    The only novel or additional features intro-
duced by said statute was the right of a company owning
a city street railway to extend its line beyond the city
limits in streets not less than 100 feet wide, and to oper-
ate such line by motor power.    Subject to these express
privileges, there is nothing in the language of the act
which expressly or by fair implication modifies or abridges
the right and power of the city to regulate this particular
street railway exactly as it may regulate street railways
in general.    It needs no argument to demonstrate that
the side or margin of the highway may be the most natural

and convenient location of a street railway in a rural neighborhood, but it is even a plainer proposition that when, by increase of population, the city expands, and the rural highway becomes a city street, lined on either hand with residences or places of business, a track so located and used for the frequent passage of swiftly moving cars may become an intolerable inconvenience and source of peril, especially to those upon the immediate front of whose property it operates. We have no hesitancy in holding that the remedying of such condition by requiring the track to be removed to the middle of the street is a reasonable regulation, which the city may enforce. If we are to treat the company as operating under the Thomson-Houston franchise, the reasons we have given for sustaining the order made by the city are no less applicable. All other lines in the city are in the middle of the street. As a matter of common observation, we know that such is the usual, ordinary, and most convenient location; and we may well conclude that upon purchasing the Thomson-Houston system, and assuming its obligation to construct an electric line from the business portion of the city over First avenue to the city limits, the company adopted the old motor track as a temporary expedient only, and that as such the city has permitted its use. It may justly be said that, when reduced to its lowest terms, there is no real dispute between the parties as to the propriety of placing the tracks in the mi ;dle of the street. The railway company not only professes a desire to make the change, but insists upon its legal right to do so under Crdinance No. 409. The city desires the change, but insists upon its right to make the order independent of said ordinance. When the discussion is shorn of all nonessentials and side issues, we find the real question to be, not whether the tracks shall be moved to the middle of the street, but whether, having so moved its tracks, the company may occupy its new location under the terms of Ordinance No.

409.   This, as we have seen, means the yielding to the company of the exclusive possession of the 20-foot strip in the middle of the street, the exclusion of the general public therefrom, and the exemption of the company from contributing to the expense of paving the street. Whether the city possesses the right, under any circumstances, to thus carve out and withdraw from the public use a part of the street for the benefit of the railway company we need not decide. We have already held that the ordinance which attempted so to do has been duly repealed, and that the company acquired no such vested right thereunder as can now be asserted against the city or the general public. There is nothing unreasonable in requiring the company to put its tracks at grade, and to pave the ground that it occupies in the street wherever such paving is duly ordered. The statute contemplates it. · Code, sections 834, 835. Such construction gives the general public unrestricted access to and use of the entire street from curb to curb, subject to the right of the company to the proper use of its track.   With rare exceptions, it is the universal plan adopted wherever street railways systems exist.   In the absence of express qualification, it is the kind of construction which the law presumes to be intended. *Freiday v. Transit Co.*, *supra.*   Moreover, the Thomson-Houston franchise required the rails to be so laid as not to interfere with the safe crossing of the tracks by vehi·les, and that requirement is as binding upon the present company as it was upon its grantor.   The city was plainly well within the limit of its authority in ordering the track laid at grade and in requiring the company to pave whenever such improvement is properly ordered upon the street occupied by it.

VI.   The decree of the district court as it appears in the record is not entirely clear as to the time when and the manner in which the railway company shall be required to pave.   We think that, to avoid all ambiguity and

uncertainty, the form of the decree should be so modified that the defendant shall be required to pave only so far as the street occupied by it is now paved, or may hereafter be duly ordered paved, and that the material used and the manner of making such improvement shall be as provided in the ordinances or resolutions of the council providing therefor.    The modified decree may, at the option of either party, be entered in this court.

The additional relief asked by the city's amendment to its cross-petition concerning the company's line between Twentieth street and the city limits was properly dismissed by the district court.    When such improvement is deemed necessary, the city should order it in the usual manner by its constituted authorities, and we cannot assume in advance that it will not be observed by the company.

With the modification above indicated, the decree of the district court is AFFIRMED.