WILLIAM LOUDEN et al., Appellants, v. J. P. STARR, Mayor, et al., Appellees.

**MUNICIPAL CORPORATIONS: Streets—Dedication—Acceptance—**
1 **How Shown.** Acceptance of the dedication of a public street may be shown by use, and recognition on the part of the city and public generally. Written acceptance by way of ordinance or resolution is not exclusive. (Sec. 751, Code, 1897.)

**MUNICIPAL CORPORATIONS: Streets—Vacation—Disposal of Va-**
2 **cated Street—Review by Courts—Arbitrary Action.** A city or town has undoubted power to vacate a public street (Sec. 751, Code, 1897) and, after vacation, to dispose of the land as it deems best (Sec. 883, Code, 1897), even by conveyance, for instance, to a railway company; and the exercise of such powers will be interfered with by the courts only in a clear case of arbitrary and

unjust exercise of the power. In instant case, *held*, vacation not arbitrary.

PRINCIPLE APPLIED: Certiorari to annul the vacation of a street. A railway track and plaintiffs' place of business abutted on the west and east sides, respectively, of a north and south street, 66 feet wide, and not in general use by the public for travel. Plaintiffs, on the east side, were practically opposite the freight and passenger depots. A switch crossed said intervening street and furnished plaintiffs with adequate trackage. Neither the east and west street to the south nor the one to the north of plaintiffs' main buildings was opened across the railway tracks, the path of the one to the south being blocked by the passenger depot. The public would be served if the east and west street north of the passenger depot were opened across the tracks. The city vacated and conveyed to the railway company the west half of this north and south intervening street from the south line of plaintiffs' main building to a point some three blocks north, in consideration of the railway company's opening across its tracks the east and west street north of its passenger depot and maintaining the crossing. The railway company accepted the vacation and complied therewith. After the vacation and conveyance, no change appears to have been made in the use of the street. Plaintiffs yet had 33 feet of street to the west of their buildings, a street both to the north and to the south, and an alley on the east. *Held*, vacation was not arbitrary.

MUNICIPAL CORPORATIONS: Streets—Vacation—Constitutional-
3 ity of Statute—Special Laws. The legislative department, having plenary power over the highways of the state, may delegate to a city or town the power to vacate; therefore, Sec. 751, Code, 1897, investing *all* cities and towns with power to vacate, is not a *special* law within the meaning of Art. 3, Sec. 30, Constitution.

MUNICIPAL CORPORATIONS: Streets—Vacation—Power Not Con-
4 ditioned on Prior Payment of Damages—Constitutional Law. The "vacation" of a public street is not a *taking* of private property for public use within the Constitution, Art. 1, Sec. 18, even though, as a consequence of such vacation, an abutting property owner is damaged. Such vacation may be legally ordered without *first* having the consequential damages, if any, to abutting property, assessed and paid or secured; therefore, Sec. 751, Code, 1897, is not unconstitutional because containing no provisions for first assessing and paying the damages consequent on vacation.

*Appeal from Jefferson District Court.*—HON. FRANK
EICHELBERGER, Judge.

SATURDAY, OCTOBER 2, 1915.

ACTION in certiorari to declare void a certain ordinance passed by the defendant city vacating a certain street. Judgment for the defendants.—*Affirmed*.

*Rollins J. Wilson, Leggett & McKemey*, for appellants.

*E. F. Simmons*, City Solicitor, *J. P. Starr*, and *R. J. Bannister*, for appellees.

GAYNOR, J.—This is a proceeding in certiorari to have an ordinance of the city of Fairfield declared invalid. The issue tried was whether the city council exceeded its authority and acted illegally in vacating the west half of North Seventh Street and conveying the part vacated to the Chicago, Rock Island & Pacific Railway Company. The cause was tried to the court upon evidence taken in open court, and upon a final hearing, it was found that the ordinance in question was a valid ordinance; that the city council, in adopting the ordinance, was in the exercise of the powers granted by the legislature to the councils of cities and towns. The writ of certiorari, theretofore issued by the court, was quashed and the ordinance sustained. From this action the plaintiffs appeal.

The ordinance in question is known as No. 134, and is, so far as material to this controversy, as follows:

"Sec. 2. That all that part of the west one-half of North Seventh Street, between the south line of West Grimes Street and the north line of West Broadway Street in the city of Fairfield, Jefferson county, Iowa, be and the same is hereby vacated.

"Sec. 3. That all rights which may have been acquired by the public, in a certain way across the depot grounds of the Chicago, Rock Island & Pacific Railway Company between West Broadway Street and West Burlington Street in the city of Fairfield, be and the same are hereby surrendered and the said public way is hereby vacated.

"Sec. 4. That all that part of North Seventh Street in the city of Fairfield, Jefferson county, Iowa, which is vacated by section 2 of this ordinance be and the same is hereby granted to the Chicago, Rock Island & Pacific Railway Company for railroad purposes.

"Sec. 5. That there is hereby granted to the Chicago, Rock Island & Pacific Railway Company the right to maintain and operate a certain railway track, now located in North Seventh Street, commencing at or near the north line of West Broadway Street and extending in a northerly direction across West Briggs Street and then in a northwesterly direction to a connection with one of the tracks of said railway company. There is also granted to the Chicago, Rock Island & Pacific Railway Company the right to lay down and maintain a track along the east line of North Seventh Street, between the north line of West Briggs Street and the south line of West Grimes Street, and to cross North Seventh Street at or near the south line of West Grimes Street, the east rail of said track when constructed shall not be a greater distance than six feet from the east line of North Seventh Street. The said railway company is to have the right to connect said track with the track first mentioned in this section at or near the north line of West Briggs Street, or may build and operate said track independently from the afore-mentioned track. The right to construct and operate the said track, between the north line of West Briggs Street and the south line of West Grimes Street, is conditioned upon the said railway company first paying or satisfying the legal damages which may accrue to the abutting property owners.

"Sec. 6. In consideration to the foregoing grants, the said Chicago, Rock Island & Pacific Railway Company grants to the city of Fairfield, Iowa, a strip or tract of land sixty-six feet in width, over and across its depot grounds in the city of Fairfield including that part of North Seventh Street vacated by section two of this ordinance as an extension of and opening up of West Briggs Street in the city of Fairfield, Iowa, being the street opened up across the said depot

grounds under the terms of said ordinance number 124, and agrees to maintain reasonable safe and adequate crossings over said railway tracks for vehicles and pedestrians, which shall include the construction of approaches, plank crossing and cement walks, in accordance with the ordinances of the city of Fairfield, at the point where said West Briggs Street crosses its depot grounds. And said railway company also grants to said city any and all rights they may have obtained or acquired, under and by virtue of ordinance No. 124, to that part of the east half of North Seventh Street laying between the north line of West Burlington Street and the south line of West Grimes Street in said city. Nothing in this ordinance, however, shall be construed to prevent the said railway company from constructing and maintaining railway tracks across that portion of West Briggs Street granted to the city of Fairfield and operating railway trains thereover.

"Sec. 7. This ordinance shall not be effective until accepted by the Chicago, Rock Island & Pacific Railway Company by written acceptance to be filed with the city clerk within sixty days after the passage hereof, which written acceptance shall be entered on the records of the city as a part thereof and which written acceptance shall be construed and held as a grant to the city of Fairfield, Iowa, by said railway company of that part of its depot grounds in that city, sufficient to make an extension of West Briggs Street sixty-six feet in width over and across its said depot ground, subject to the terms of this ordinance and when said acceptance is filed as aforesaid, the same, together with its ordinance, shall constitute a contract between the said railway company and the city of Fairfield.

"Sec. 8. When the written acceptance of the Chicago, Rock Island & Pacific Railway Company is filed and entered of record, as required by Sec. 7 of this ordinance, then this ordinance shall be published by one insertion in the Fairfield Daily Journal, and this ordinance shall be in full force and effect from and after its publication."

This ordinance and its conditions, so far as the railroad Company was involved, were duly accepted by the company on the 10th day of June, 1912.

It appears that the plaintiffs herein, as trustees for the Louden Machinery Company, hold the legal title to the west half of Lots 2 and 3 in Block 4, and all of Lots 2, 3, 5 and 6 in Block 9 of Gage's Addition to the city of Fairfield, and are the successors in interest and privies in title to Electa W., Theodore S., Cranmore W. and Sarah J. Gage; that this land lies immediately east of and abuts on North Seventh Street, and is between West Broadway on the south and West Hempstead Street on the north; that there is a street running east and west between Blocks 4 and 9, known as Briggs Street.

It appears that, prior to the 9th day of August, 1870, the Gages were the owners of the land now owned by the plaintiffs, with other land, situated in the north half of the southwest quarter of Section 26, Township 72, Range 10; that on said 9th day of August, the Gages, being the owners of and then in possession of said land, sold and conveyed to the Chicago, South Western Railway Company a portion of the land then owned by them; that in the deed of conveyance it was agreed that each party to said deed should keep open for public use a street four rods wide along the east side of the tract therein conveyed, two rods in width to be taken from the land conveyed, and two rods in width from the land of the grantors adjoining this strip; and that North Seventh Street is the street referred to in said deed.

The plaintiffs allege in their petition that the street so set apart as North Seventh Street was dedicated to the public by the joint action of the Gages and the Chicago, South Western Railway Company. It appears that these plaintiffs are the successors in title from the Gages to the land now owned by them, and that the Chicago, Rock Island & Pacific

Railway Company, mentioned in the ordinance, is the successor of the Chicago, South Western Railway Company.

We herewith attach a plat of a portion of North Seventh Street and the lots adjacent thereto on the east.

The railroad track on the east side of Seventh Street, shown on the plat, adjacent to plaintiffs' property, was placed there under and by virtue of an agreement entered into between the plaintiffs and the Rock Island Railway Company. The freight house of the Chicago, Rock Island & Pacific Railway Company is immediately west of plaintiffs' buildings, as shown upon this plat, and west of the street known as North Seventh Street. The passenger depot of the railway company stands across West Broadway. West Broadway, in its full width, is eighty feet wide. The track on the west side of plaintiffs' buildings is used by the railway company in carrying freight to plaintiffs' buildings. The greater part of the freight is taken from the car directly into the building. There are doors on the west side of the building on Block 9, for receiving freight from the cars, and there are no platforms in front of these doors. The freight is delivered directly from the cars into the building. No other cars, except those carrying freight to plaintiffs' warehouse, were permitted to use or to occupy this track. This track is about four feet, eight inches wide, and the east rail about two feet from plaintiffs' building, leaving just room enough to allow a car to pass freely down the track.

There does not appear to have been any change in the use of North Seventh Street since the vacation of it. There are no buildings on North Seventh Street north from Broadway that open or face on Seventh Street, except the plaintiffs'.

After the passage of this ordinance, the railway company opened Briggs Street, as provided in the ordinance, over their right of way. Sidewalks and plank crossings have been put in.

There is an alley extending north and south, dividing Block 9 through the center, and extending from West Briggs Street to West Broadway.

This is all of the record which we need set out in order to give an understanding of the controversy here and the disposition which is made of it in this court.

Section 751 of the Code provides:

"Cities and towns shall have power to establish, lay out, open, widen, straighten, narrow, vacate, extend, improve and repair streets, highways, avenues, alleys, public grounds, etc.; but no street, avenue, highway, or alley which shall hereafter be dedicated to public use by the proprietor of the ground in any municipal corporation shall be deemed a public street, avenue, highway, or alley, or be under the use or control of such municipality, unless the dedication shall be accepted and confirmed by an ordinance or resolution specially passed for such purpose."

We think we are justified in assuming, from this record, that North Seventh Street, in controversy, was dedicated to the public use by the proprietors of the ground upon which it rests; that this dedication was duly accepted by the city. It does not appear, affirmatively, that it was accepted by ordinance, yet it is assumed and practically conceded by the plaintiffs, in their application for this writ that it was a public street, used as such, recognized as such, and conceded to be such, and, whether accepted by ordinance or not, it was a public street under the rule laid down in *Byerly v. City of Anamosa,* 79 Iowa 204, *City of Waterloo v. Union Mill Co.,* 72 Iowa 437, *Shea v. City of Ottumwa,* 67 Iowa 39, and *Snouffer v. Cedar Rapids & Marion Railway Co.,* 118 Iowa 287-297. These plaintiffs and the railway company, in dealing with this street, treated it as a public street, and recognized the authority of the city over it as a public street.

1. MUNICIPAL CORPORATIONS: streets: dedication: acceptance: how shown.

This question needs no further consideration. See also, as bearing upon this question, *Vorhes v. Town of Ackley,* 127 Iowa 658; *Backman v. City of Oskaloosa,* 130 Iowa 600.

2. MUNICIPAL CORPORATIONS: streets: vacation: disposal of vacated streets: review by courts: arbitrary action.

Sec. 751, above set out, by its terms gives to cities and towns the power to narrow or vacate its public streets. The power in the city to do this has been consistently recognized by this court.

In *Gray v. Iowa Land Co.,* 26 Iowa 387, 389, it was said: "If the city authorities had the power to order the vacation, plaintiff's case is at an end, for the objection made goes, as we understand, to the want of power, and not to the manner of its exercise."

The charter under which the city of Clinton acted in vacating the streets expressly declared that the city council had power to lay off, open, widen, straighten, narrow, vacate or extend, etc., and in that case it was held that the city, under such a charter, had the power to vacate a public street.

In *McLachlan v. Town of Gray,* 105 Iowa 259, an action to enjoin the city from vacating a highway within its limits, it was said: "We understand the General Assembly has plenary power over streets and may vacate or discontinue the public easement in them, and may invest municipal corporations with this authority." It was further said: "It is established in this state, as elsewhere, that under authority from the General Assembly, the municipalities have power to vacate streets." In this case, most of the authorities, preceding the pronouncement therein made, are reviewed.

In *Spitzer v. Runyan,* 113 Iowa 619, the plaintiff sued out a writ of certiorari to test the validity of an ordinance passed by the city of Vinton, whereby certain streets and alleys were vacated, and the land comprised therein granted to the Burlington, Cedar Rapids & Northern Railway Company for depot purposes. This court, in discussing the authority of the city to so do, said: "Sec. 751 . . .

authorizes cities and towns to vacate streets and alleys. It is said by appellants that this power can be exercised only for some public purpose, and that the purpose here is not public. While the power to vacate is not arbitrary and may to some extent be controlled by the courts, the cases are exceptional where such interference is authorized'' (citing authorities). It is therein recognized that the city may vacate public streets or alleys and devote the same to private use.

See *City of Marshalltown v. Forney*, 61 Iowa 578; *Harrington v. Railway Company*, 126 Iowa 388; *Lake City v. Fulkerson*, 122 Iowa 569, and *Walker v. City of Des Moines*, 161 Iowa 215.

Code Sec. 883, in defining the powers of cities and towns, provides:

"They shall have power to dispose of and convey lands unsuitable or insufficient for the purpose for which they were originally acquired, but when such lands are so disposed of, enough thereof shall be reserved for streets to accommodate adjoining property owners. Conveyances executed in accordance with this section shall extinguish all the rights and claims of the city or town existing prior thereto. They shall have power also to dispose of the title or interest of such corporation in any real estate, or any lien thereon, or sheriff's certificate therefor, owned or held by it, including any street or portion thereof vacated or discontinued, however acquired or held, in such manner and upon such terms as the council shall direct."

As construing and applying this statute, see *Spitzer v. Runyan, Mayor, et al.,* 113 Iowa 619, in which it is said: "If, then, we must accept as valid the vacation of these streets and alleys, the only question remaining is the right of the city to grant the land they covered to the railroad company. Sec. 883 of the Code settles this matter in defendant's favor."

As bearing upon this question, see *Lake City v. Fulkerson, supra; Harrington v. Railway Company,* 126 Iowa 388.

We have, therefore, statutory and judicial authority for saying that a city or town, through its council, may vacate or narrow a public street, and, having done so, is invested with the authority to dispose of the land covered by the street so vacated, and that, where this power has been exercised by the council in good faith, and for what it believes to be the public good, the courts will not interfere with their action in so doing.

The power of the city to vacate a street, when exercised for the public good, is practically unlimited, and the conclusion of the city council as to what is for the public good ordinarily is conclusive. Some of the cases herein cited perhaps go to the limit in affirming the rights of the city, but such cases are modified, if we may call it so, by what is said in *Walker v. City of Des Moines,* 161 Iowa 215, which expresses the rule to which this court is now committed. This last case, with the others, recognizes the power of the city, under Sec. 751, to vacate its streets and alleys, and to do this in such manner and upon such terms as the council directs. It also recognizes the doctrine that, having effected the vacation, the title to the street continues in the city, and that it may convey the ground vacated to another, to be used for private purposes; that, when vacated, it ceases to be a street, and the right of the public is divested; and that in all essentials, after vacation, it becomes the private property of the city. But it is therein said: "It is well settled that, though the city has the power to vacate its streets and alleys, this power may not be exercised arbitrarily, and in disregard of the trust for the use of the public," citing 2 Elliott on Roads and Streets, Sec. 1182, in which it is said: "Whether it is expedient to discontinue a highway is a question for legislative decision, and when the authority to discontinue is delegated to local officers, and no restrictions are placed upon its exercise, the officers

are invested with a very broad discretion, and unless this discretion has been abused, the courts cannot interfere.''

A question has arisen in many cases in which it was claimed that the city, in the exercise of the power to vacate, had acted arbitrarily, wantonly, or in total disregard of the public right, and it seems to be thought by many courts that, even where this power is conferred on the city, its action may be controlled, annulled or set aside, where it is apparent that the public's interest was not a moving factor in the doing of the act; that is, where the city, under a pretense of exercising its authority under this statute, seeks to destroy the public right in and use of the street, and does this, not for the public good, but for the purpose of enabling private persons to occupy it, or to obtain the exclusive use or control of it, the courts will interfere to prevent such action on the theory that the city is, in so doing, exercising the power granted in violation of the trust imposed. This question is discussed in *Horton v. Williams,* 99 Mich. 423, and in *Smith v. McDowell,* 148 Ill. 51, reported in 22 L. R. A. 393.

Applying this limitation upon the authority of the city council to the case at bar, we find that the street in question was not a street generally used by the public for travel; that, in the judgment of the council, it was necessary that there be a way open over the railway company's right of way through Briggs Street for the accommodation of citizens of the city residing in the east portion thereof; that Briggs Street, when properly opened and devoted to the purposes of travel, afforded a convenient and accessible way for the people of the city (numbering something like eight hundred) to reach the business portion.

In consideration of the vacation of the west half of North Seventh Street between the points indicated, and the conveyance of this strip so vacated to the company, the Chicago, Rock Island & Pacific Railway Company granted to the city a strip or tract sixty-six feet wide over and across its depot grounds, as an extension of and opening up of West Briggs

Street, and agreed to maintain the crossing so made reasonably safe and adequate for vehicles and pedestrians, and that this should include the construction of approaches, plank crossings, and cement walks, in accordance with the ordinance of the city.

We find no evidence of an arbitrary or unjust exercise of the power granted to the city. It acquired what it considered of greater value to the city and the public than was that which it surrendered.

The state has, and has always assumed, control over all the public highways within its borders. Through its legislature, it has authority to and has delegated to cities the control of public highways, streets, and alleys within the limits of the city. All municipal corporations are the creatures of the state, and come into existence and derive their rights and powers through the general laws of the state. The state, through its legislature, has delegated to municipalities so created, certain powers. In this way, it seeks to and does exercise its original powers through the instrumentality of these municipalities. When we assume that the state has power over all public highways,—power to control and regulate the same,—and, through its legislative bodies, has power to create municipalities and to bestow upon them, when created, powers of local self-government, we are very near to the conclusion that the legislature has a right to delegate to these municipalities control over the public highways within their limits. This certainly is not class legislation. The powers are general, and are granted to all municipalities created by the legislature in the same way and to the same extent, when they are of like character, and the granting of this power is not in violation of Article 3, Sec. 30, of the Constitution of this state.

3. MUNICIPAL CORPORATIONS: streets: vacation: constitutionality of statute: special laws.

It is insisted that the state, through its legislative authority, cannot take private property for public use without *first*

making compensation; that such act would be in contravention of the provisions of Article 1, Sec. 18, of the Constitution, which reads: "Private property shall not be taken for public use without just compensation first being made, or secured to be made, to the owner thereof," etc.; and it is contended that, as this power does not lie in the legislature, it cannot delegate to the city authority to do that which it could not do itself; that Sec. 751 of the Code, heretofore referred to, authorizing the vacation and narrowing of streets, makes no provision for the payment of any damages which may be suffered by a private citizen by reason thereof, and is, therefore, void as in contravention of the constitutional provision.

4. MUNICIPAL CORPORATIONS: streets: vacation: power not conditioned on prior payment of damages: constitutional law.

It is further argued that this ordinance is void because it made no provision for compensation to abutting property owners.

No part of the plaintiffs' property was taken by the vacation of this street. The most that can be contended is that plaintiffs' property was *damaged* by the action of the city in vacating the street. Conceding, for the sake of argument, (the question is not directly involved here) that the plaintiffs did suffer some damage by the exercise of the power granted to the city council, yet the constitutional provision above referred to, and the inhibition therein do not cover the question of damages to property. In many of the states it does. In many of the states, the Constitution provides for the payment of damages, and in some states it is held that the word "taken" includes damages that are the proximate result of such act, even where the Constitution does not so provide. But in none of the states where the Constitution is silent as to damages has it been required that compensation first be made before the damages are inflicted. The damages in such case are only consequential, and cannot be ascertained or determined with any degree of accuracy before the completion of the act out of which the damage arises; and in those

states where it is held that damages are recoverable, the party suffering the damages is left to his legal remedy to recover. See *Ridgway v. City of Osceola*, 139 Iowa 590. This was an action to recover damages occasioned to the plaintiff by the vacation of a public street and alley. In this case, the right to recover was recognized when it was shown that the damages suffered by the abutting landowner were different from those of the general public, but it was there held: "If the owner still has free access to his property and to the improvements thereon, and his means of ingress and egress are not substantially interfered with, no damages may be recovered."

There is a difference between the vacation of a public street and damages incident thereto, and the taking of private property for use as a public street. In the taking of private property for a street, the injury is direct, immediate, and ascertainable at once and the constitutional provision applies, and compensation must be first made; but in the vacation of a street, the damages are not direct, immediate, or at once ascertainable. In fact, the vacation of a street may be a direct benefit to abutting property owners. The damages in such case are merely consequential, and though recoverable in an action against the city, it is not necessary that they be first ascertained and paid.

As supporting this proposition, see *Vanderburgh v. City of Minneapolis*, (Minn.) 108 N. W. 480. In that case it was said: "Originally our Constitution . . . provided that private property should not be taken for public use without compensation *first* being paid or secured to the owner. It was subsequently amended, and now provides that private property shall not be taken or 'damaged' without compensation." That case was an action against the city to recover damages for vacating a public street, and the contention of the plaintiff was that the ordinance vacating the street was invalid because no provision was made for compensating abutting owners at the time the council adopted the resolution vacating the street. The court said: "If we were to

follow the general rule on the subject, and hold that because plaintiff's damages were not previously ascertained and paid, the action of the council in vacating the street was void, it might cause much litigation and confusion in the cities and other municipalities of the state. No doubt many streets and alleys have heretofore been vacated under circumstances precisely like those shown in this case, no compensation by way of damages having been ascertained or paid. . . . The damages for injuries of this nature, where no property is actually taken, are consequential, not direct. No person is actually deprived or dispossessed of his property, and the authorities hold that prepayment is unnecessary. The damages in such case may be recovered against the municipality. That remedy is adequate and sufficiently protects all constitutional rights."

See *Clemens v. Connecticut Mutual Life Insurance Co.*, (Mo.) 82 S. W. 1; *Wetherill v. Pennsylvania Ry. Co.*, (Pa.) 45 Atl. 658; *Morris v. City of Philadelphia*, (Pa.) 49 Atl. 70; *McGee's Appeal*, (Pa.) 8 Atl. 237; *Parker v. Catholic Bishop of Chicago*, (Ill.) 34 N. E. 473. This last named case was an action involving the vacation of a street. It appears that the street had been vacated by the action of the city council. It was thought by the plaintiff that such action was void because, although no part of the complainant's property was taken, yet by the provisions of the Constitution of the state, similar to ours, the vacation was void, for the reason that, before such vacation would be valid, the city council was required to first ascertain and pay the complainant damages. In that case it was held that such contention was not sound. It was further said: "While private property cannot be taken by public authority for private use, it may be taken or damaged for a public use upon payment of just compensation. . . . It seems to be well settled . . . that where no part of the land or property of the complaining owner is physically taken for or in making the proposed public improvement and the damages claimed to result are therefore consequential only,

this provision of the Constitution does not require the ascer-
tainment and payment of such damages, as a condition prece-
dent to the exercise of the right or power"—citing *Stetson
v. Railroad Co.*, 75 Ill. 74, 76; *Insurance Co. v. Heiss*, 141 Ill.
35. The case further says: "It seems to be sufficient to
answer the constitutional requirement that a remedy is pro-
vided for the recovery of such damages." The court, refer-
ing to the *Stetson Case, supra,* said: "It was there held, and
it has been repeatedly since followed, that the damages there
referred to were direct and physical, resulting from a taking
of a portion of the land, and that where no portion of the
land was taken, the damages suffered are consequential, and
that condemnation proceedings were not required to be insti-
tuted to ascertain the same."

The rights of the plaintiffs, if any they have, against the
Rock Island Railway Company to have the west side of North
Seventh Street kept open for public use, are not involved
in this suit, and we do not make any pronouncement upon
that question.

There are other questions argued in the submission of
this cause, but they are not relevant to the matter here sub-
mitted for our determination. We find no error in the
action of the court and the cause is therefore—*Affirmed.*

DEEMER, C. J., LADD, WEAVER, EVANS, PRESTON, JJ., con-
cur; SALINGER, J., specially concurs.

SALINGER, J. (concurring specially). I concur in affirm-
ance, but I do so upon the single ground that the city has full
power to order the vacation of a street or alley, and to trans-
fer the ground after the vacation has been completed. It fol-
lows that certiorari will not lie, for that reviews only an ex-
ceeding of power or other illegal action. I am not inclined
to follow the case of *California P. R. Co. v. Central Pacific
Railroad Co.*, 47 Cal. 528, which sustains certiorari because
vacation had been ordered without pre-ascertainment and pre-
payment of damages. But I think the decision has no occa-

sion to determine whether our constitutional provision regarding pre-ascertainment and prepayment of damages applies here. I dissent from so much of the opinion as does this for reasons fully stated in the dissent in *Hubbell v. City of Des Moines,* decided at this present term.